In order to render the opinion which I am about to deliver as perspicuous as possible, I will state the substance of those confiscation laws which relate to the present question; the first, which was passed in 1777, comprehends three descriptions of persons:
1st. Those who on the 4th July, 1776, were absent from the (388) State and the United States, and continued absent when the law was passed.
2d. Those who at any time during the war attached themselves to or abetted the enemies of the United States.
3d. Those who have withdrawn themselves from the State or any of the United States, since the 4th of July, 1776, and still continue beyond the limits of the United States.
Of all such persons the property is declared to be confiscated, unless they shall, at the next General Assembly, which shall be held after the 1st October, 1778, appear and be admitted to the privileges of citizens, and restored to the property which once belonged to them.
The second, passed in January, 1779, to carry the former into effect, after reciting in the preamble that many persons within the description of the first had failed to appear, declares that all the real and personal estates of such persons shall be forfeited to the State, and vested in the same for the uses expressed in the act. The act then proceeds to direct the appointment of commissioners, and to prescribe their duties, with respect to renting the real and selling the personal estates; and to the 6th section is added this proviso: "That the wife, child, or children of such absentee or absentees, now in or under the protection of this or the United States, shall be allowed so much of the estate of such absentee or absentees as such wife, child, or children might have enjoyed, and have *Page 324 
been allowed, if such absentee had died intestate in this State or any of the United States."
The third act, passed in October, 1779, recites that many of the persons coming within the description of the former, have failed or neglected to appear, according to the requisitions of the first act, whereby they have clearly incurred and become liable to the penalties of the first act. The persons who have thus clearly incurred the penalties of the said act are then enumerated, and among them Robert Palmer is specially named. The 16th section repeals and makes void the act passed in (389) January, 1779. The 17th section reserves to the wives and widows of the described persons, who reside within the State, the right of dower, and directs that a proper subsistence should be allowed to them out of the sale of their husbands' estates, for themselves and the minor children who reside in the State. The quantum of the allowance is, however, to be ascertained by the Assembly. The confiscation laws subsequently passed have no other connection with the case before the Court, than being parts of one system; they may occasionally serve to explain and illustrate the intention of the Legislature. The plaintiff sets up a title to the premises under William Palmer, who, it is said, as eldest son of Robert Palmer, became seized by the operation of the proviso contained in the law of January, 1779. If under that clause he acquired a clear and obvious title, a very interesting inquiry would arise, to ascertain how far it was affected by a subsequent repeal of the act; a question which may, perhaps, on investigation, appear to be embarrassed with new and peculiar difficulties, on account of the manner in which repealing clauses are worded, almost uniformly throughout our statute book. That right acquired, or acts done, under a statute, while it remains in force, continue unimpaired and valid, notwithstanding its subsequent repeal, is a well know principle of law; but it seems to be different when a former act is declared to be null and void. The view I have of the present case does not require me to give any opinion on this point, though I confess that nothing short of the clearest conviction would induce me to decide that a title acquired by the proviso was taken away by the subsequent act, because, upon the supposition that Robert Palmer's estate was confiscated by the law of January, 1779, the proviso for his resident children is founded in the clearest principles of justice, and not forbidden by any obvious reasons of policy. To rescue innocence from the punishment denounced against delinquency; to combine the indispensable measures of self-preservation, with a beneficent regard to the rights of humanity, were objects highly becoming the legislative character, and they have been accordingly attended to in all the (390) laws upon this subject, though the modes have been varied *Page 325 
according to the urgency of the times. To a greater or less degree the principle has been kept in view throughout the whole system: peccatasuos teneant auctores; nec ulterius progrediatur metus, quam reperiaturdelictum. No law provides so amply for the children as that of January, 1779; no other gives them that portion of their father's estate which they would have inherited in case of intestacy; it would therefore be most agreeable to discover satisfactory grounds upon which to decide in favor of a title claimed under this proviso. But the right being claimed as one strictly legal, and created by a positive law, it must appear to be so to those who are required to give it judicial sanction. The principal question then is, Was the estate of Robert Palmer confiscated by the Act of January, 1779? If the affirmative of this question should be established, two others naturally arise in the case, viz.:" whether the terms of the proviso are sufficiently operative to vest an immediate seizin in William. And lastly, if they were, then whether it was divested by that law being subsequently repealed and made void. Upon the latter question it is unnecessary for me to give an opinion, because I think no confiscation in the particular case was effected by the act. The freehold must have been divested from Robert Palmer before it could be granted by the State to William; but a legislative declaration, that a certain description of persons had incurred the penalties of the law, and that their estates were thereby confiscated, could not of itself effect a silent transfer of their property. Such an act must from its very nature be inchoate, and fall short of its object, until the property of the persons described be seized, as having incurred the forfeiture. To determine whether a person's conduct had been such as the law intended to punish, and to ascertain what property in consequence thereof had accrued to the public, various methods might have been devised, and probably that adopted by the act was no less effectual than any other. Whatever steps are directed to be taken for this end should have been pursued, and in the manner prescribed. They seem essential to impart to the law its intended rigor and operation; and this will (391) be more apparent when the directions and different modes of proceeding are particularly examined. Commissioners are to be appointed, who are to give bond, and perform their duties under the sanction of an oath. They are to take possession of their property for the use of the State; to enter in a book the property which has come to their knowledge or possession, with the name of the former owners, and whether there are any adverse claimants; and they are to report their proceedings to the county court. If any citizen of the State, or of the United States, puts in a claim to the lands, the proceedings of the commissioners are to be transmitted to the Superior Court, where the question is to be *Page 326 
finally determined. If any person having a claim do yet neglect to exhibit it before the county court, and their property is in consequence wrongfully sold, the Assembly is to reimburse them. These, and other things contained in the law, were so many qualifications to the general confiscatory clause, and necessary to determine when and how they should operate. They furnish a proof that the Legislature had in view that principle of the common law that the State can neither take nor give lands without some solemn and authentic act or matter of record. The requisite degree of certainty and solemnity was contemplated in the discharge of the several duties assigned to the commissioners. It is said in Page's case, 5 Co., 53, "There are two manner of offices; one that vesteth the estate and possession of the land in the State, when it hath not any right or title before, and that is called an office of entitling as in case of purchase by an alien, etc. There is another office, and that is called an office of instruction; and that is where the estate of the land is lawfully in the State before, but the particularity of the land doth not appear on record, so that it may be put in charge." An attainder for treason is put by the writer as an example of the latter kind; and the nature of that, when examined, shows that the proceedings directed by the act in question ought to be viewed as an office of entitling. By the English law an attainder follows either from the judgment of (392) outlawry or of death, in cases of treason and felony; or it is created by an act of parliament, passed for the very case. In the first instance, the forms of proceeding being regulated by preexistent laws, require the utmost certainty and precision; in the latter, the penalties of an attainder are invariably inflicted upon the offenders by name; and that some degree of certainty is necessary in this respect, appears from Fort., 86. By whatever means, therefore, an attainder arises, it is a solemn and notorious act, specific in its object, personal in its direction, and not requiring the aid of other circumstances to complete a divesture.
It does not appear from the special verdict that any proceedings whatever were had against Robert Palmer's estate under this law; and thence I think it follows that the title continued in him until the Act of October, 1779, when he was specially named, and his estate confiscated. The act itself may be regarded as a proof that the Legislature entertained the same opinion. For if Robert Palmer's estate was effectually confiscated by the first law, where was the necessity of passing another for the same purpose? If the first divested all his estate, there was nothing left upon which the latter could operate; for it seems he was absent from the country in the intermediate time. Nor is this kind of proof weakened by the supposition that the latter act may operate upon such property as *Page 327 
was not disposed of to William by the first, such as the dower of the wife, or the share of a child not resident. This is assuming what no reasonable construction of the act will warrant; namely, that so much of the property as was not allowed to William, as a resident child, remained in Robert. The law either amounted to a confiscation or it did not; if it did, then two-thirds of the real, and a share of the personal estate, were to be allowed to William; the other third of the real, and the shares of the personal, would clearly belong to the State, if there were no resident children. In either case nothing remained to Robert; for the nature of a proviso is to except something from the operation of the purview, which must otherwise have been subject to it.
After what has been stated, it would be almost unnecessary to (393) add that, in my opinion, the real estates of those persons who were the objects of the confiscation acts, were not divested by the declaration of rights — that instrument had a very important operation in vesting in the people of the State certain rights appertaining to tenure, which were before in the King and lords proprietors; but the individual titles derived from others were not, I think, meant to be affected.
Judgment for the defendant.
Judge MACAY gave no opinion in this case, being interested in some lands claimed by the lessors of the plaintiff.
Upon the same grounds, Judge HALL gave no opinion, because he had not been appointed until after the opinions of the other Judges had been made up.
NOTE. — See, on the second point, Bayard v. Singleton, ante, 5.